In re the **LESLIE FAY COMPANIES, INC. SECURITIES LITIGATION.**

This Document Relates To: All Actions.

No. 92 Civ. 8036 (WCC).

United States District Court, S.D. New York.

Oct. 22, 1993.

As Corrected Nunc Pro Tunc Oct. 27, 1993.

Abbey & Ellis, Chairman of Plaintiffs' Executive Committee, New York City, Arthur N. Abbey, Mark C. Gardy, Stephen J. Fearon, Jr., of counsel, Milberg Weiss Bershad Hynes & Lerach, Member of Plaintiffs' Executive Committee, New York City, Barry A. Weprin, Jeffrey S. Abraham, of counsel, for plaintiffs.

Shea & Gould, New York City, Leon P. Gold, Arthur D. Felsenfeld, Jonathan Young, of counsel, for defendant BDO Seidman.

### OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This class action is brought by plaintiffs on behalf of all individuals who purchased common stock of The Leslie Fay Co., Inc. ("Leslie Fay" or "the Company") between February 4, 1992 and April 5, 1993. The complaint

alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, and asserts claims for aiding and abetting securities fraud against a number of Leslie Fay's officers and directors and BDO Seidman ("BDO"), the Company's outside auditor. The action is currently before the Court on BDO's motion to dismiss pursuant to Rules 9(b) and 12(b)(6), Fed.R.Civ.P. The motion is denied.

## BACKGROUND

In early 1992, Leslie Fay, a well-known manufacturer of women's apparel, made a number of statements which touted the firm's 1991 performance and made positive prognostications as to its anticipated 1992 results. Compl. ¶¶ 27–30. These representations, at least as to the 1991 results, were supported by the firm's SEC filings. On March 27, 1992, Leslie Fay filed its 1991 10–K Form in which it formally reported net income of $29.4 million on net sales of $836.6 million, or $1.55 net income per share, which compared favorably with 1990's net income of $29 million on net sales of $859 million, or $1.53 net income per share. The 10–K filing included BDO's February 7, 1992 opinion letter which represented that Leslie Fay's operation results and cash flows for 1991 had been computed in conformity with generally accepted accounting principles ("GAAP") and that BDO's audit was performed in accordance with generally accepted accounting standards ("GAAS"). Compl. ¶ 33.

Reports of Leslie Fay's positive performance continued through the first half of 1992. On April 22, 1992, the Company's first quarter Form 10–Q filing reported earnings of $0.56 per share, up 2 cents per share compared with the first quarter of 1991. Compl. ¶ 35. At the annual meeting on April 29, 1992, the Company's CEO touted its future prospects, Compl. ¶ 36, and on June 5, 1992, Leslie Fay announced its intention to repurchase one million of its common shares over the next year. Compl. ¶ 37. On July 14, 1992, the Company announced that second quarter earnings, like those of the prior quarter, would be record breaking. Earnings of $1,636,000, or $0.09 per share, were reported which showed a remarkable improvement over the $70,000, or less than $0.01 per share, which had been earned in the second quarter of 1991. Compl. ¶ 38. In his September 9, 1992 retirement announcement, defendant Alan Golub, president and COO of the Company, stated that Leslie Fay was positioned for excellence in the 1990's despite the difficult economic climate. Compl. ¶ 43.

The tone of Leslie Fay's public statements began to change in mid-September of 1992. On September 14, 1992, the Company announced that, as a result of the weak economy, it would earn only about $0.60 per share in the third quarter of 1992 and that the Company now projected that earnings for 1992 as a whole would approximate those of the prior year. Compl. ¶ 44. In response, Leslie Fay stock fell $3.00 to a close of $12.25 on the day after this announcement. Id. Nonetheless, the Company maintained that it was in a good position to weather this cyclical economic storm. Compl. ¶¶ 44, 45. The third quarter earnings, announced on October 20, 1992, were consistent with the September 14 forecast. Compl. ¶ 46.

In February of 1993 the house of cards that was Leslie Fay began to crumble. On February 1, 1993, the Company announced that it had requested that the board of directors' audit committee commence an investigation into "accounting irregularities" which might cause Leslie Fay to restate previously reported earnings for 1991 and to eliminate any profit for 1992. Compl. ¶ 47. The Company suspended Corporate Controller Donald Kenia pending the outcome of the investigation, but Leslie Fay's CEO, John Pomerantz, insisted, in a widely distributed press release, that the financial viability of the Company was not in jeopardy. Id. On the same day Leslie Fay's General Counsel, Herman Gordon, announced that the audit committee would investigate inaccurate entries involving an overstatement of inventory and a reduction of the cost of goods sold. Gordon explained:

> The people responsible for giving (outside) auditors the company balance sheet, schedules and back-up data were not able to produce them because of these entries.

Compl. ¶ 49. As a result of this announcement, trading in Leslie Fay stock was suspended and at the end of the trading day the stock had fallen to $7⅞ per share from its close of $12 per share on the previous day. Compl. ¶ 48. On February 2, 1993, it was reported that Kenia had admitted that he and 15 other employees of the Company's Wilkes–Barre, Pennsylvania offices had been falsifying invoices for over one year, and the Company announced that the false entries began in the last quarter of 1991 and continued through all of 1992. Compl. ¶¶ 55,50. Upon announcing his fraud, Kenia stated that he was coming forward because the discrepancies caused by the falsifications had become too large to hide. Compl. ¶ 55. On February 16, 1993, Leslie Fay announced that it had commenced an investigation into possible false SEC filings made by the Company, and on March 26, 1993, it was announced that Leslie Fay was the subject of a Commission investigation as well. Compl. ¶ 58,62. On February 26, 1993, Leslie Fay announced the preliminary financial results of the Audit Committee. The $29 million, or $1.55 per share, originally reported as earnings for 1991 was revised to $17 million, or $0.91 per share. In addition, a loss of $13.7 million, or $0.72 per share was estimated for 1992. The Company also announced that BDO had withdrawn its opinion of the Company's 1991 financial statement. Compl. ¶ 60. On March 22, 1993, Paul Polishan, CFO of the Company, took a leave of absence pending the final outcome of the Audit Committee report. Compl. ¶ 61. Finally, on April 5, 1993, Leslie Fay filed a voluntary bankruptcy petition under Chapter 11 of the Federal Bankruptcy Code, and in response, its common stock price fell to $2.75 per share. Compl. ¶¶ 64,63.

For the purposes of this motion, it is important to note that the only false statements which are attributed to BDO are those made in the Company's 1991 10–K statement. BDO admits that these statements were false when they were made; indeed this was the rationale for BDO's withdrawal of its opinion. BDO argues only that the complaint fails to allege sufficiently that it made these statements with scienter.

The complaint makes three factual allegations in support of its claim that BDO acted with the requisite mental state. First, plaintiffs point out that the accounting firm had a long and profitable relationship with Leslie Fay. Compl. ¶ 67. Second, the complaint claims that BDO either intentionally or recklessly failed to audit Leslie Fay in accordance with GAAS. Compl. ¶¶ 67,70. Finally, it is alleged that BDO either intentionally or recklessly failed to discover that the Company had not prepared its books in accordance with GAAP. Compl. ¶ 69. In support of this allegation the complaint notes that BDO failed to discover that the Company was violating an accounting rule requiring that inventory be valued at the lower of cost or market so that there will be a proper matching of costs against revenue and requiring that unrealized profits not be credited to income. Compl. ¶ 69(d) & (e).

## DISCUSSION

Motions, like the one at bar, which attack Rule 10b–5 pleadings for their failure to allege a factual basis supporting scienter are particularly troublesome because it is unclear what type of recklessness is considered sufficient to establish scienter. BDO contends that Rule 10b–5 requires a showing of recklessness which is tantamount to intentional or deliberate conduct, while plaintiffs claim that the Second Circuit has not qualified its holding that reckless behavior is sufficient to support scienter. As discussed in "Part I" below, we tend towards the former position although we believe that a fact finder may *infer* intent from extremely reckless behavior.

Our discussion of what plaintiffs must prove to satisfy the scienter requirement is relevant here only to the extent that it sheds light on what must be pled to sustain a claim under Rule 10b–5. On a motion to dismiss we accept all allegations in the complaint as true, and dismiss only if, after drawing all inferences in plaintiffs' favor, it is clear that they are not entitled to relief. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir. 1989); *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). BDO brings this motion under Rule 9(b),

Fed.R.Civ.P., which requires that averments of fraud state the circumstances constituting fraud with particularity. However, Rule 9(b) must be read in the context of Rule 8(a) which calls only for a short plain statement of the claim for relief. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). Further, Rule 9(b) does not require that mental conditions such as intent or knowledge be averred with particularity although plaintiffs must allege a factual foundation which creates an inference of scienter. *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988); *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987). Finally, a plaintiff need not plead facts under Rule 9(b) if they are particularly within the opposing party's knowledge. *DiVittorio*, 822 F.2d at 1247. Given these considerations, we find that plaintiffs have alleged facts which support a conclusion of recklessness on the part of BDO from which a reasonable fact finder may draw an inference of intent, and thus, BDO's motion is denied.

*I. The Standard For Proving An Outside Auditor's Scienter Under 10b-5*

In support of its argument that Rule 10b-5 requires proof of some type of intentional, knowing, or deliberate behavior, BDO cites *In re Fischbach Corp. Sec. Litig.*, 1992 WL 8715 (S.D.N.Y.1992), and, to the extent it is applicable here, we are persuaded by Judge Wood's well-reasoned opinion. As discussed in *Fischbach*, the confusion over what constitutes scienter under 10b-5 began when the Supreme Court created the scienter requirement in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In *Hochfelder* the Court noted that

the language of section 10(b) and its legislative history reveal a congressional intent to proscribe knowing or intentional misconduct. *Id.* at 197, 217, 96 S.Ct. at 1383, 1392. However, the Supreme Court left open the possibility that "in some circumstances" reckless behavior may be sufficient to support a 10b-5 claim. *Id.* at 193–94 n. 12, 96 S.Ct. at 1381 n. 12. As discussed in *Fischbach*, the Second Circuit then reaffirmed its pre-*Hochfelder* position that recklessness may support a 10b-5 claim in *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 44–46 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), but noted the distinction between "a merely negligent misstatement and the kind of recklessness that is equivalent to wilful fraud." *Id.* at 46; *see Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 120–21 (2d Cir.1982) (the type of recklessness actionable must approximate an actual intent). Judge Wood took the position that the "kind of recklessness" to which the Second Circuit was referring in *Rolf* and *Decker* is limited to those circumstance where the defendant *deliberately* failed to acquire the information that would have indicated that his statements were false and misleading. *Fischbach* at *6 (emphasis added). However, Judge Wood acknowledged the uncertainty in this area, and she limited her opinion to only those circumstances where the complaint fails to allege either wilful blindness or any incentive therefor. *Id.* at *7. As the cases cited by plaintiffs indicate, this is indeed a murky area of law in this circuit. For example, in a relatively recent articulation of the scienter standard, the Second Circuit stated without qualification that recklessness was sufficient to show scienter under 10b-5. *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir.1991).[1]

1. The confusion over what must be pled and what must be proven to show scienter in a 10b-5 case is so severe that it has resulted in conflicting opinions in the same case. In *Ades v. Deloitte & Touche,* the court was presented with a complaint which alleged that an accountant either knowingly or recklessly failed to comport with GAAS and GAAP. At first the court found that these allegations met the requirements of Rule 9(b). *Ades,* 1991 WL 126043, *1–*2 (S.D.N.Y.1991). However, upon the accountant defendant's motion for reconsideration, the court reversed its prior decision and dismissed the

allegations with leave to replead. *Ades v. Deloitte & Touche,* 1992 WL 6142, *2–*3 (S.D.N.Y. 1992). In this opinion the court cited *Decker* and noted: "The complaint must allege facts establishing that an accountant had *become aware* of the economic viability of the underlying business at the time the allegedly fraudulent statements, opinions, or reports were made or issued." *Id.* at *3 (emphasis added). However, the plaintiffs in *Ades* then amended their complaint and the accountant renewed its Rule 9(b) objections thereto, arguing that the amended complaint did not set out factual allegations establishing that

We are persuaded that a *Fischbach*-like standard should be applied in this instance because most of the cases which discuss scienter in the context of auditor accountants use language which seem to require such a degree of recklessness that deliberate avoidance can be inferred. *Decker,* 681 F.2d at 120–21 (the type of recklessness actionable must approximate an actual intent to aid in the fraud being perpetrated by the audited company); *The Ltd., Inc. v. McCrory Corp.,* 683 F.Supp. 387, 394 (S.D.N.Y.1988) (dismissing securities fraud claim against accountant because of the failure to allege recklessness tending to establish accountant's knowledge); *see HB Holdings Corp. v. Scovill Inc.,* 1990 WL 37869, *11 (S.D.N.Y.1990); *In re Am Int'l, Inc. Sec. Litig.,* 606 F.Supp. 600, 606–07 (S.D.N.Y.1985) (citing *Decker*). Thus, at least when applied to outside auditors, 10b–5 proscribes only behavior which is either deliberate or so reckless that an inference of fraudulent intent might be drawn by a reasonable finder of fact.

## II. The Complaint Sufficiently Alleges BDO's Scienter

The question now becomes whether plaintiffs have alleged a sufficient factual foundation to support an inference that BDO knew, or was so reckless that one might reasonably conclude that it knew, that Leslie Fay's 1991 financial statement was artificially inflated. It is often stated that there are two ways to allege scienter under 10b–5: the first is to set out facts showing a motive for committing fraud and a clear opportunity to do so; and the second is to identify circumstances indicating conscious behavior by defendant. *In re AnnTaylor Stores Sec. Litig.,* 807 F.Supp. 990, 1006 (S.D.N.Y.1992); *Ades,* 799 F.Supp. at 1498. However, the Second Circuit authority cited for this proposition does not indicate that these are the exclusive methods for pleading scienter in a 10b–5 claim. *See Cosmas,* 886 F.2d at 13 *and Beck v. Manufactures Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *RICO claim overruled, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.) (en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24, 25 (1989). *Cosmas* states only that a motive to commit fraud need not be pled if plaintiffs adequately identify circumstances indicating conscious behavior, and *Beck,* although articulating the general proposition for which it is cited, did so in the context of discussing a mail and wire fraud claim which, the court noted, requires a showing of *intentional* fraud. *Beck,* 820 F.2d at 49. It follows that in 10b–5 cases, where an inference of scienter may be raised by a showing of extreme recklessness, plaintiffs need only allege facts evidencing extreme recklessness. Other cases in this district have implicitly so held. *Ades,* 799 F.Supp. at 1498 (although citing the language in *Beck,* allegations of recklessness found sufficient to support a 10b–5 claim); *Duke v. Touche Ross & Co.,* 765 F.Supp. 69, 75–76 (S.D.N.Y.1991) (scienter based on extreme unreasonableness of the assumptions upon which accountant's predictions were based); *National Union Fire Ins. Co. v. Cooper,* 729 F.Supp. 1423, 1433 (S.D.N.Y.1989) (allegation that accountant acted recklessly satisfied Rule 9(b)); *In re Frank B. Hall & Co., Inc. Sec. Litig.,* 693 F.Supp. 1460, 1465 (S.D.N.Y. 1988) (upholding a securities claim because accountant's valuation of corporation's discontinued operation may have been grossly negligent under GAAP). Indeed any other conclusion would be nonsensical since plaintiffs would be required to plead more than they would be required to prove at trial.

We find that the complaint sufficiently alleges recklessness of such degree as to support an inference of actual intent. BDO

the accountant knew the actual financial condition of its client at the time the alleged fraudulent statements were made. *Ades v. Deloitte & Touche,* 799 F.Supp. 1493, 1498 (S.D.N.Y.1992). This time around, the court rejected the accountant's argument, citing *Breard* and reasoning that the Second Circuit has not qualified its holding that recklessness was a sufficient basis for scienter under 10b–5. *Id.* at 1499 & n. 6. In this decision the court distinguished *Fischbach* by pointing out that the complaint in *Ades* did not include allegations that actually undermined the plausibility of wilful blindness, but the court made no attempt to distinguish *Decker* despite the fact that it had found *Decker* dispositive in its earlier decision. We sympathize with the court

endorsed Leslie Fay's 1991 annual report but failed to discover that the actual income for that year was less than 60% of the income actually reported and that the Company had committed inventory fraud to the extent of $12 million. Plaintiffs point to BDO's long and profitable history of providing Leslie Fay with auditing and other accounting services as a possible motive for BDO turning a blind eye to the Company's fraudulent accounting, and the complaint specifies particular accounting laxities at Leslie Fay that BDO either intentionally or recklessly disregarded. These facts, taken together, state a claim for recklessness from which intent might be inferred. *See Siemens Info. Sys., Inc. v. TPI Enter., Inc.*, 1992 WL 51559, *7 (S.D.N.Y.1992).

■ We acknowledge that, in an ideal world, the complaint would further particularize these recklessness allegations. For example, defendants cite cases where complaints were found not to comply with Rule 9(b) because they failed to allege what further procedures the accountants should have performed. *Weinberger v. Kendrick*, 451 F.Supp. 79, 83–84 (S.D.N.Y.1978); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 523–24 (S.D.N.Y.1977);[2] *see Am. Int'l*, 606 F.Supp. at 606–07. However, the specifics of BDO's auditing procedures strike us as the type of facts which are particularly within defendants' knowledge and therefore, need not be included in the complaint. *See DiVittorio*, 822 F.2d at 1247.

■ Defendants also cite authority to the effect that the existence of an accountant-client relationship alone is not sufficient to demonstrate a motive to defraud. *Friedman v. Arizona World Nurseries Ltd.*, 730

F.Supp. 521, 533 (S.D.N.Y.1990); *HB Holdings*, 1990 WL 37869 at *11; *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127–28 (7th Cir.1990), *cert. denied*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). However, we tend to align ourselves with the authority to the contrary. For example in *Fischbach* Judge Wood noted:

> The defendant is motivated not to 'open his eyes' to the underlying facts, since this would place him in a position of terminating his profitable financial situation and exposing his associate, or continuing to participate in the fraudulent activity, but now without his cherished modicum of deniability. The combination of this motivation and otherwise unlikely degree of mere carelessness gives rise to an inference of deliberate disregard for the facts.

*Id.* at *6; *see Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 979 (E.D.N.Y.1988), *vacated on other grounds*, 714 F.Supp. 1285 (E.D.N.Y.1989); *see also Siemens*, 1992 WL 51559 at *7. In any case we do not rely on BDO's motive alone but consider it as one of the facts alleged by plaintiffs which, when taken together with the others, tends to support a finding of BDO's recklessness. *Siemens*, 1992 WL 51559 at *7 (accountant-client relationship among factors considered in denying motion to dismiss).

■ Plaintiffs distinguish a number of cases cited by BDO by pointing out that the magnitude of the fraud alleged in those cases does not approach the magnitude of the fraud alleged here. *See e.g., Decker*, 681 F.2d at 120–21.[3] BDO dismisses this argu-

---

in *Ades* because we find ourselves in a similar conundrum.

2. It should also be noted that in *Jacobson*, unlike the case at bar, there was a question as to the magnitude or existence of the alleged financial overstatement. In addition the court in *Jacobson* stated that allegations of knowledge or recklessness may be alleged in conclusory terms under Rule 9(b). *Id.* at 524.

3. In *Decker* plaintiffs had drafted an "everything-but-the-kitchen-sink" complaint that in many ways failed to comply with the liberal pleading requirements of Rule 8, Fed.R.Civ.P. *Id.* at 114.

To support their claim against the accountant defendant, the plaintiffs in *Decker* alleged that the accountants had recklessly failed to discover their client's practice of making illegal payments to third parties, and the complaint alleged that the accountants had violated several generalized accounting principles. *Id.* at 120. The Court in *Decker* held that these allegations failed to set out the "type of recklessness which approximates actual intent". Unlike the accountant defendant in *Decker*, BDO is alleged to have violated more specific accounting rules regarding the valuation of inventory and the recording of profits. This, coupled with the fact that BDO's client has confessed to massive inventory fraud, we believe distinguishes the case at bar from *Decker*. Inven-

ment by pointing out that recklessness, from which an inference of actual intent can be drawn, must be proven in all fraud cases, big and small alike. Defendant's statement, although technically correct, is not relevant for a motion which attacks plaintiffs' pleadings. In cases where small accounting errors only ripple through the corporate books, a court may conclude, at times even on the face of the complaint, that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a 10b–5 claim. On the other hand, when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading. The complaint reveals that in 1991, for every dollar actually earned by Leslie Fay, the Company fraudulently concocted 71 cents of earnings. In addition, given that the creation of fraudulent inventory was concentrated in the last quarter of 1991, Leslie Fay's false profits for this quarter probably far outweighed its actual profits. Alleged fraud of this magnitude, coupled with plaintiffs' other allegations, creates an implication of recklessness, on the face of the pleading, which compels us to deny defendant's motion. If, as BDO contends, it was as much a victim of the fraudulent inventory cover-up at Leslie Fay as were plaintiffs, facts supporting such a conclusion may be presented upon summary judgment. However, at this early stage in the litigation, we will not deny plaintiffs the opportunity to conduct discovery on their well pled complaint. *See Billard v. Rockwell Int'l Corp.,* 683 F.2d 51, 57 (2d Cir.1982) ("there is an obvious tension between the requirements of Rule 9(b) and the practicality of alleging in elaborate detail facts constituting fraud prior to discovery").

### III. The Aiding And Abetting Claims Against BDO

▇▇▇▇ BDO also moves to dismiss the aiding and abetting claims made against it. To state a claim for aiding and abetting a securities violation plaintiffs must allege: (1) a securities violation by a primary wrongdoer, (2) "knowledge" of the violation on the part of the aider and abettor, and (3) substantial assistance by the aider and abettor in perpetrating the fraud. *Bloor v. Carro, Spanbock, Lodin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985); *IIT, an Int'l Inv. Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980). Again BDO claims only that the complaint fails to allege facts supporting its scienter.[4]

▇▇▇▇ To some extent scienter in the aiding and abetting context has been more precisely defined than in the context of primary 10b–5 liability. Recklessness is sufficient to support a claim for aiding and abetting only if the defendant owes a fiduciary duty to the party defrauded. *IIT,* 619 F.2d at 922. However cases within this district have held that only recklessness need be alleged to establish an accountant's scienter where plaintiffs are third parties whose reliance upon the accountant's audit or opinion letter was foreseeable. *CMNY Capital, L.P. v. Deloitte & Touche,* 821 F.Supp. 152 (S.D.N.Y.1993); *Ades,* 799 F.Supp. at 1502; *Axel Johnson, Inc. v. Arthur Andersen & Co.,* 762 F.Supp. 599 (S.D.N.Y.1991); *see Mishkin v. Peat, Marwick, Mitchell & Co.,* 658 F.Supp. 271 (S.D.N.Y.1987) (J. Weinfeld). The complaint states that BDO's letter withdrawing its auditor's opinion of Leslie Fay's 1991 financial records states:

> [BDO] hereby request[s] that you take reasonable steps to notify any persons who are likely to be relying on our opinion that

tory valuation is an important consideration in a corporate audit and certainly more central to the auditing accountant's function than is policing corporate ethical violations. Similarly, in *The Ltd.,* 683 F.Supp. at 394, plaintiffs claimed that an acquired company had not made adequate accounting provisions for retail mark downs. Likewise, in *Skubik v. Leeds,* 1981 WL 1631 (S.D.N.Y.1981), although inventory fraud was alleged, plaintiffs failed to specify who was responsible for the inflated inventory and how the situation came about. Clearly *The Ltd.* and *Skubik* did not involve the type of wholesale inventory

fraud alleged in the case at bar. *But see HB Holdings,* 1990 WL 37869 at *2 (auditor dismissed despite relatively large fraud alleged).

4. BDO also takes issue with the fact that the aider and abettor claim is combined with the claim directly against it under 10b–5. *See Ahmed v. Trupin,* 781 F.Supp. 1017, 1026 (S.D.N.Y.1992). This is a somewhat technical objection to the complaint which, standing on its own, does not justify dismissing plaintiffs' claim.

our opinion has been withdrawn and should not be relied upon.

Compl. ¶ 60. Therefore, recklessness is sufficient to show scienter in support of the aiding and abetting claim made against BDO. And, as our analysis above indicates, recklessness from which a reasonable fact finder might infer knowledge is sufficiently set out in the complaint.

## CONCLUSION

For the foregoing reasons BDO's motion to dismiss is denied.

SO ORDERED.