MEMORANDUM OPINION
KAPLAN, District Judge.
In L.L. Capital Partners, L.P. v. Rockefeller Center Properties, Inc., 921 F.Supp. 1174 (S.D.N.Y.1996) (“L.L. Capital I”), familiarity with which is assumed, this Court granted defendant’s motion to dismiss the complaint and judgment was entered accordingly. The Court subsequently granted plaintiffs motion for relief from the judgment and leave to file an amended complaint. Defendant now moves to dismiss the amended complaint.

Background

The original complaint alleged that the Registration Statement improperly failed to disclose that (a) Rockefeller Center Properties, Inc. (“RCP”) was aware that Mitsubishi and the Rockefeller family were likely to cease funding the loan and that the Borrowers therefore were likely to default on the loan in the foreseeable future, (b) RCP was urging Mitsubishi to acquire RCP or restructure the loan, and (c) Mitsubishi during the fourth quarter of 1993 had rebuffed RCP’s attempts to enter into discussions regarding their future relationship. The Court held that the first of these alleged nondisclosures was not material as a matter of law because it related only to RCP’s subjective view of the likelihood that the loan would be funded. 921 F.Supp. at 1178-80. It held that the second was not material because the alleged nondisclosure related solely to RCP’s wish to explore restructuring or an acquisition which, at least as long as it was unrequited, would not have altered the total mix of publicly available information in the circumstances of this ease. Id. at 1180-81. The Court assumed, although it was far from clear in the complaint, that the third of plaintiffs claims alleged that Mitsubishi knew RCP’s purpose in seeking a meeting, but refused to meet with RCP. It concluded that the materiality of this alleged fact could not be determined on a Rule 12(b)(6) motion but nevertheless granted the motion to dismiss on the ground that plaintiff had failed to plead fraud in connection with this alleged nondisclosure with the particularity required by Fed. R.Civ.P. 9(b).

The Sufficiency of the Amended Complaint Materiality

RCP’s Alleged Belief that Funding Would Cease

The complaint alleged that RCP, at the time of the offering, had a “growing belief’ that the funding would stop, had “grown concerned about Mitsubishi’s unwillingness to fund the Deficits ... ”, and knew “that Mitsubishi and the Rockefeller family were likely to cease funding the Deficits or the Loan ...” (Cpt ¶¶ 16,18, 25) In short, it sought to premise liability, insofar as this point is concerned, exclusively on the failure of the defendant to disclose its own subjective evaluation of the likely future actions of third parties. The amended complaint seeks to deal with this deficiency.
Paragraph 16 now alleges, in addition to the assertions contained in the original version, that RCP and others urged Mitsubishi to restructure the Loan or acquire RCP, actions which allegedly “reflected [RCP’s] conclusion that (1) the Rockefeller family could no longer be relied upon for continued funding of the Deficits or the Loan; and (2) Mitsubishi, likewise, was unlikely to continue the funding the Deficits or the Loan in its present form. Thus, RCP’s own actions con *297 firm its knowledge that Mitsubishi and the Rockefeller family were intending, for the first time since 1985, to cease to fund the Deficits or the Loan.” Paragraph 20 contains new language asserting that Mitsubishi’s rebuff of RCP’s alleged attempts to discuss the deficits “signaled Mitsubishi’s decision to cease funding ...” And paragraph 34 of the amended complaint, in language that did not appear in the complaint, alleges that RCP “had direct knowledge of specific events demonstrating the strong and growing likelihood that the Rockefellers and Mitsubishi would cease to fund the Deficits ...”
Statements added in the amended complaint, read generously, allege that Mitsubishi and the Rockefeller family had decided, by the time the Registration Statement had been issued, to cease funding. There is no allegation, however, that this information was communicated to RCP. Rather, the amended complaint, like that previously dismissed, alleges only that RCP management had seen straws in the wind that led it to conclude that Mitsubishi and the Rockefeller family either had decided not to continue funding the deficits or were likely to come to that decision. For the reasons expressed in the Court’s original decision, even if RCP had reached such an internal conclusion, its failure to disclose that information, in the context of this case, does not give rise to a claim under the federal securities laws.

Rejection of Possible Restructuring or Acquisition

The Court dismissed plaintiffs claim that defendant violated the securities laws by failing to disclose that it had decided to explore the possibility of a restructuring of the loan or an acquisition by Mitsubishi of RCP on the ground that RCP’s perhaps uncommunicated and in any case unrequited desire for such a deal was immaterial as a matter of law.
The amended complaint now squarely alleges that RCP actually urged Mitsubishi to engage in such a transaction and that Mitsubishi rejected the overture. (Am Cpt ¶¶ 16-17, 19) The threshold question therefore is whether the failure to disclose these facts, assuming it was accompanied by any requisite mental state, violated the securities laws.
As L.L. Capital I explains, a duty to disclose arises under the securities laws only from the “express mandates” of the laws and regulations or the antifraud rules — the requirement of disclosure where disclosure is necessary to make that which has been said not misleading. L.L. Capital I, 921 F.Supp. at 1179; see In re Time Warner Inc. Securities Litig., 9 F.3d 259, 267-68 (2d Cir.1993). Here there is no suggestion that RCP was obliged by any specific provision of the securities laws to disclose Mitsubishi’s alleged rebuff. Rather, the claim is that RCP’s use in the Registration Statement of “the same kind of boiler plate disclosures it had made for several years while emphasizing that the Borrowers’ parents had regularly funded [the] Deficits for eight years” (cpt ¶ 19) was misleading in view of the alleged Mitsubishi rebuff. While plaintiff does not put it in so many words, the essence of the claim is that the Registration Statement’s disclosures, identical as they were to past statements by RCP, implied that nothing had changed in the Mitsubishi relationship and that Mitsubishi’s rebuff rendered that implication misleading. In any ease, however, the fundamental question is whether there is “a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the ‘total mix’ of information available.” Id. (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (internal quotations omitted)).
Here the Registration Statement did not even allude to the possibility of an extraordinary transaction involving Mitsubishi. Indeed, it disclosed that Mitsubishi was under no obligation to continue to fund the loan, thus clearly alerting investors to the possibility that Mitsubishi, to use the vernacular, would pull the plug. Hence, there is substantial force to the contention that disclosure of Mitsubishi’s rebuff of RCP’s overture was not necessary to render anything that RCP actually said not misleading. Nevertheless, the Court is not entirely persuaded.
The Registration Statement here disclosed the enormous cumulative deficit, as well as *298 the fact that the Rockefellers and Mitsubishi were not obliged to continue to fund it. As previously noted, any rational reader therefore would have known that RCP was faced with default unless (a) Mitsubishi and the Rockefellers continued to fund, despite the lack of any obligation to do so, or (b) some extraordinary transaction offering a way out of the dilemma could be found. L.L. Capital I, 921 F.Supp. at 1181. In this as in any other mortgage transaction, the most obvious candidates for participation in an extraordinary transaction to bail out a troubled mortgage loan are the mortgagee and, if the owner of the property is solvent, the owner. Here, Mitsubishi owned 80 percent of the equity in the Borrowers and thus was the most obvious source of funds if default was to be avoided. The fact, if indeed it be a fact, that Mitsubishi had rejected any such possibility narrowed the options available to RCP in an important way.
In these circumstances, it may well be argued that the Registration Statement implicitly represented that an extraordinary transaction involving Mitsubishi was a possibility. If a trier of fact were so to read it, the trier might conclude also that the failure to disclose Mitsubishi’s alleged rebuff rendered the Registration Statement materially misleading. As the Second Circuit observed in somewhat analogous circumstances in Time Warner, these are questions for the trier of fact, id. at 268, assuming that this claim survives defendant’s Rule 9(b) challenge, to which the Court now turns.

Rule 9(b)

This Court dismissed the one legally sufficient claim of a material omission contained in the original complaint — the claim based on the nondisclosure of Mitsubishi’s alleged refusal to meet with RCP to discuss its post-1994 plans — on the ground that the complaint did not “allege facts that give rise to a strong inference of fraudulent intent” as required by Rule 9(b). L.L. Capital I, 921 F.Supp. at 1183 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994)). Plaintiff has sought to remedy this deficiency, as well as to provide a basis for its allegation of scienter with regard to the added nondisclosure allegation in the amended complaint that the Court has found legally sufficient.
As Chief Judge Newman wrote in Time Warner, “[c]ases of this sort present an inevitable tension between two powerful interests” — the interest in deterring and remedying fraud in the capital markets and “the interest in deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal ...” 9 F.3d at 263. Rule 9(b) serves an important purpose in reconciling these interests by raising the bar over which a securities fraud plaintiff must pass to remain in federal court. The challenge is to fix the bar at precisely the right level, neither too low nor too high.
In recent years, the Second Circuit has made clear that a securities fraud plaintiff may satisfy Rule 9(b) “either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.” Shields, 25 F.3d at 1128; accord, L.L. Capital I, 921 F.Supp. at 1183 (citing cases). But this test is only a means to an end — a determination whether the facts alleged “give rise to a strong inference of fraudulent intent” absent which the complaint will be dismissed. Shields, 25 F.3d at 1128; accord, e.g., San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 812 (2d Cir.1996); Acito v. IMC-ERA Group, Inc., 47 F.3d 47, 52 (2d Cir.1995); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir.1993); In re Time Warner Securities Litig., 9 F.3d at 268; O’Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991); Ouaknine v. MacFarlane, 897 F.2d 75, 80 (2d Cir.1990); Connecticut National Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir.1987); Ross v. A.H. Robins Co., 607 F.2d 545, 558 (2d Cir.1979), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); see Powers v. British Vita, P.L.C., 57 F.3d 176, 184 (2d Cir.1995) (same requirement in RICO).
Plaintiffs first argument is that the requisite strong inference of fraud may be drawn *299 from the fact that RCP knew the possibly material facts that were not disclosed — it knew that Mitsubishi had refused to meet to discuss its future intentions and had rebuffed an overture directed at achieving an extraordinary transaction — but nevertheless did not alter its prior disclosure language. (Pl.Mem. 8-11) There are two fatal flaws in the argument, however.
To the extent that plaintiff argues that a strong inference of fraud must be drawn from the mere fact of a material omission, it ignores the fact that scienter — intent to defraud or recklessness — is an essential element of plaintiffs Rule 10b-5 cause of action. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); SEC v. Coven, 581 F.2d 1020, 1025 (2d Cir.1978), cert. denied, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979). While it undoubtedly is true that the nature of a particular omission in a particular factual context may give rise to an inference of fraud or recklessness, it would be folly to hold, as plaintiff would have the Court do, that the knowing failure to disclose a material fact in and of itself necessarily gives rise to a strong inference of fraud. There are far too many circumstances in which a material omission would evidence no such mental state. The person or entity responsible might have held a perfectly reasonable and good faith, if ultimately mistaken, belief that the fact omitted was not material, to name but one. Hence, the adoption of so mechanical a rule would gut Rule 9(b) and lower the bar to unwarranted litigation far too low. See Powers, 57 F.3d at 192 (Newman, C.J., dissenting).
Quite apart from the error in suggesting that a material omission necessarily gives rise to an inference that the omission was made with a fraudulent or reckless state of mind, the facts in this case do not warrant such an inference. Here, the deficits, the lack of any obligation of Mitsubishi and the Rockefellers to continue to fund them, and the likely consequences of a failure either to persuade them to continue to fund or to find another solution to the Borrowers’ problem all were fully disclosed by defendant and well known to the public. That the Borrowers and RCP would seek to find some way out of this most unhappy situation was obvious to all. That neither Mitsubishi nor the Rocke-fellers yet had “stepped up to the plate” was equally obvious from the lack of such an announcement. In these circumstances, RCP may well have thought that the alleged refusal by Mitsubishi to discuss its future plans or to engage in a restructuring or acquisition — a refusal that allegedly took place in the fourth quarter of 1993, almost two years before the May 1995 expiration of the letters of credit securing the funding of the deficits through that date (am cpt ¶¶ 14-15) — was neither unequivocal nor irrevocable and therefore was not sufficiently significant to warrant disclosure, particularly given the extensive disclosure that was made concerning the risk that funding would cease.[1] In any case, the facts are not such that defendant’s knowledge of Mitsubishi’s refusal to meet or consider an extraordinary transaction strongly suggests reckless or conscious misbehavior as opposed to a good faith effort to discharge defendant’s obligations under the securities laws[2] in an appropriate manner or simple negligence.
Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989), the case upon which plaintiff relies in support of this argument, serves to illustrate its deficiency. The defendant in that case had issued bullish statements about its prospects and, it fairly may be said, touted its stock by pointing to important new institutional sales to the People’s Republic of China (“PRC”). Id. at 10. Some months later, it announced a write down of inventory due to the cancellation of anticipated sales to PRC customers as a result of PRC import restrictions. Id. The Second Circuit upheld the *300 amended complaint against a Rule 9(b) attack on the ground, among others,[3] that the requisite inference of scienter could be drawn from the defendant’s knowledge of the import restrictions. Id. at 13. The import restrictions, however, were an obvious and unequivocal bar to the achievement of the rosy results that the defendant had predicted from sales to the PRC. If the defendant knew of the restrictions, as the amended complaint alleged, it almost certainly knew that its bullish statements were false or acted in reckless disregard of their truth — quite unlike the situation in this ease. In consequence, even if Cosmos is properly read as drawing the inference of scienter solely from the defendant’s knowledge of the PRC import restrictions, the ease is of no avail to plaintiff. See In re Leslie Fay Companies, Inc., Securities Litigation, 835 F.Supp. 167, 173 (S.D.N.Y.1993) (“Cosmos states only that a motive to commit fraud need not be pled if plaintiffs adequately identify circumstances indicating conscious behavior ...”).
Plaintiff seeks also to bring itself within the motive and opportunity line of cases. It argues that the defendant was motivated by a desire to raise additional capital without depressing the market price and by a threat to RCP’s corporate existence and to the continued employment of its senior management. (Pl.Mem. 11)
The Court has dealt already with the suggestion that RCP withheld the “bad news” in order to raise capital. As was pointed out in L.L. Capital I, 921 F.Supp. at 1184, San Leandro requires rejection of the argument, as the Circuit there held that an allegation that Philip Morris delayed disclosure of adverse information to maximize the marketability of a $700 million offering of debt securities was insufficient to establish the motive necessary to this branch of the Rule 9(b) test. This case, moreover, is even stronger in this respect than San Leandro because the securities issuance that supposedly motivated the nondisclosure in this case was a $21 million offering made to settle a class action rather than a material capital raising endeav- or. The offering certainly did not hold out any serious prospect of altering the dire financial straits in which RCP found itself. Hence, there is no basis for supposing it motivated an alleged fraud of the sort alleged.
The contention that RCP withheld the information in question to protect its existence and the jobs of its senior management simply is irrational. RCP and, therefore, its managers, were protected against default until May 1995 by the letters of credit. The whole world knew that the company then would be bankrupt unless Mitsubishi and the Rockefel-lers continued to fund the deficit or some other extraordinary corporate event took place. Plaintiff has not even tried to explain how RCP and its management were rendered any more secure by nondisclosure of Mitsubishi’s refusal to meet or to engage in an extraordinary transaction. If, as plaintiff suggests, Mitsubishi’s alleged actions in the fourth quarter of 1993 made it inevitable that it would “pull the plug,” plaintiff nevertheless has failed to articulate any colorable theory on which RCP or its management stood to benefit from temporarily concealing that fact, the public disclosure of which ultimately was inevitable.
As the circumstances do not give rise to a strong inference of scienter, and as there is no rational basis for concluding that defendant had any motive to commit fraud by withholding the information it allegedly withheld, the Court holds that the complaint does not allege fraud with the particularity required by Fed.R.Civ.P. 9(b). This conclusion makes it unnecessary to address defendant’s argument that the complaint fails to state a claim upon which relief may be granted because it fails to allege that plaintiff was injured as a consequence of the alleged securities law violation.

*301
Conclusion ■

For the foregoing reasons, defendant’s motion to dismiss the complaint is granted. The Clerk shall enter judgment accordingly.
SO ORDERED.

. Indeed, RCP well may have thought that the premature disclosure of such ambiguous information could subject it to liability at the suit of those who sold on the news in the event that Mitsubishi and the Rockefellers later had participated in discussions and agreed to a restructuring or an acquisition.

. Cf. Electronic Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 948 (2d Cir.1969) (recognizing that overstatement is as dangerous to securities markets as understatement).

. The Court relied also on the "implication ... that the alleged failure to qualify the bullish statements was intended to permit individual defendants to profit from an inflated market price before the truth became known.” Id. at 12 (quoting Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir.1985)).